UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LINDA MAYBEARRY,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )    No.  4:07CV1873 DJS
                                    )                    (FRB)
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
                Defendant.          )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        This cause is on appeal for review of an adverse ruling
by the Social Security Administration.  All pretrial matters were
referred to the undersigned United States Magistrate Judge pursuant
to 28 U.S.C. § 636(b) for appropriate disposition.

**I. Procedural History**

        On June 5, 2005, plaintiff Linda Maybearry filed an
application for Supplemental Security Income (SSI) pursuant to
Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.,
in which she claimed that she had been disabled since birth,
October 17, 1960.  (Tr. 45-48.)  On initial consideration, the
Social Security Administration denied plaintiff's application for
benefits.  (Tr. 18, 32-37.)  On September 20, 2006, a hearing was
held before an Administrative Law Judge (ALJ).  (Tr. 259-306.)
Plaintiff testified and was represented by counsel.  On January 26,
2007, the ALJ issued a decision denying plaintiff's claim for
benefits.  (Tr. 6-17.)  On September 6, 2007, the Appeals Council

denied plaintiff's request for review of the ALJ's decision. (Tr. 2-5.) The ALJ's determination of January 26, 2007, thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the hearing on September 20, 2006, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-five years of age. (Tr. 262.) Plaintiff weighs approximately 300 pounds. (Tr. 277.) Plaintiff left high school while in the tenth grade and never obtained her GED. Plaintiff is married but has been separated from her husband for one year. (Tr. 263.) Plaintiff has two children, twenty-one and twenty-six years of age. (Tr. 273-74.) Plaintiff lives alone in a one-story house. (Tr. 274.) Plaintiff receives Medicaid and food stamps. (Tr. 275.)

Plaintiff testified that she did not engage in any extensive work activity within the previous fifteen years. Plaintiff testified that she last worked on an assembly line at a plastics company in 1994 for two or three days. Plaintiff testified that she quit the job because her deformed right arm prevented her from performing the work that was required. (Tr. 264-65.)

Plaintiff testified that her right arm and hand have been deformed since birth. Plaintiff testified that her right arm is permanently angled outward at the elbow and that she is unable to straighten her arm. Plaintiff also testified that she has no thumb or little finger on her right hand. (Tr. 265-66.) Plaintiff

testified that she has very little strength in the right arm and could possibly lift five pounds. (Tr. 266-67.) Plaintiff testified that she has difficulty grabbing things because she is unable to bend all of the remaining fingers of her right hand. (Tr. 267-68.) Plaintiff testified that she also suffers a deformity of the left hand in that her left thumb is shortened and she has limited opposition of the thumb. (Tr. 268-70.) Plaintiff also testified to limited movement of the remaining fingers of the left hand. (Tr. 270-71.) Plaintiff testified that the strength in her left hand is not very good because of diagnosed carpal tunnel syndrome. (Tr. 271.) Plaintiff testified that she could possibly lift ten pounds with her left hand. Plaintiff testified that the limitation with her strength and grip in both hands has interfered with her ability to obtain jobs. (Tr. 272-73.)

Plaintiff testified that she was involved in a motor vehicle accident in 2002 which resulted in injuries to her right knee, back, neck, and shoulder. Plaintiff testified that she underwent arthroscopic surgery on her right knee because it was giving out on her and causing severe pain. (Tr. 275.) Plaintiff testified that the surgery did not help her condition. (Tr. 276.) Plaintiff testified that she also experiences pain in her left knee and that her physician recently advised her that she has severe arthritis in both knees. (Tr. 276-77.) Plaintiff testified that she was given medication for the arthritis. (Tr. 276.) Plaintiff testified that she has difficulty managing stairs because of the condition of her knees. (Tr. 298.)

Plaintiff testified that she underwent therapy for her back injury and that surgery had been recommended. Plaintiff testified that she did not pursue the recommendation further inasmuch as she could not undergo a necessary myelogram because she was allergic to the dye. Plaintiff testified that she last received treatment for her back one year prior. (Tr. 287-88.) Plaintiff testified that low back pain limits her to standing for ten to fifteen minutes and to sitting for half an hour. Plaintiff testified that nothing helps to relieve her back pain, including medication. (Tr. 296.)

Plaintiff testified that she experiences a constant, aching pain in her neck and left shoulder and that surgery had been recommended. (Tr. 288-91.) Plaintiff testified that the pain radiates down into the arm. (Tr. 292.) Plaintiff testified that she has been prescribed Lidoderm patches for the pain, but has obtained no relief therefrom. Plaintiff testified that her physician does not want to prescribe narcotics because of their addictive nature. (Tr. 288-91.) Plaintiff testified that having her arm in a downward position aggravates her shoulder pain and that she therefore often props her arm on a pillow. (Tr. 291-92.) Plaintiff testified that she sometimes experiences numbness and tingling in the left hand which causes instability in holding things and causes her to sometimes drop things. (Tr. 293-94.) Plaintiff also testified that she is occasionally awakened by the sensation. (Tr. 294.)

Plaintiff testified that she suffers from sleep apnea but

did not consider it to be a significant contributor to her sleeping difficulties. Plaintiff testified that she has been prescribed a CPAP machine but does not use it because she is claustrophobic and feels as though she is suffocating when she uses the machine. (Tr. 283-85.)

Plaintiff testified that she experiences shortness of breath and is unable to walk beyond half a block because of the condition. (Tr. 295-96.) Plaintiff testified that the condition was not related to her sleep apnea and that a cardiologist told her that it was a cardiac problem. (Tr. 295.)

Plaintiff testified that she had gained approximately twenty-five pounds within the previous year due to depression. (Tr. 277-78.) Plaintiff testified that her general physician had been treating her depression with antidepressant medication but that she began treatment with a psychiatrist in December 2005 because she was able to obtain insurance and because she had been having daily crying spells and her concentration was lacking. (Tr. 278-79.) Plaintiff testified that she visits her psychiatrist every three to four weeks and has been diagnosed with depression and bipolar disorder. (Tr. 279-80.) Plaintiff testified that the bipolar disorder was the primary obstacle in plaintiff being able to work inasmuch as the condition involves her not wanting to be around people. (Tr. 302.)

Plaintiff testified that at the time she filed for benefits, that is, June 2005, she was experiencing crying spells daily, was eating more and was not sleeping. (Tr. 280.) Plaintiff

testified that she was taking Paxil at the time. Plaintiff testified that she currently takes Lamictal, Wellbutrin and Symbyax. (Tr. 281.) Plaintiff testified that she feels no significant improvement with the additional medication, but that her crying spells have decreased to twice a week. Plaintiff testified that such spells sometimes last for an entire day. (Tr. 282.) Plaintiff testified that she does not socialize due to her depression. Plaintiff testified that she has no self-esteem and that she feels like a loner. (Tr. 285.) Plaintiff testified that she has no friends, has no hobbies, does not go to church, and visits only with her children and grandchildren twice a week. (Tr. 286-87.)

Plaintiff testified that she also experiences problems with concentration and sleeping on account of her depression. (Tr. 282-83.) Plaintiff testified that she awakens in the middle of the night and is usually awake for two or three hours. (Tr. 284.) Plaintiff testified that this causes her to be sleepy throughout the day and that she takes two or three naps during the day. (Tr. 284-85.) Plaintiff testified that she sleeps for two or three hours with each nap and does not stay awake for a straight eight-hour period. (Tr. 297-98.)

Plaintiff testified that she used marijuana and cocaine in the past when dealing with her depression. Plaintiff testified that she wanted to commit suicide at the time and such substances made her forget things. Plaintiff testified that she no longer uses these substances. (Tr. 304-05.)

Plaintiff testified that her doctors have recommended that she lose weight and that she exercise. Plaintiff testified that she tried walking but was unable to do so. (Tr. 303-04.)

As to her daily activities, plaintiff testified that she gets up in the morning at 9:00 a.m., takes her medicine and gets dressed for the day. Plaintiff testified that she then tries to watch some television and is usually ready to go back to sleep within a couple of hours. Plaintiff testified that she sleeps upright for twenty to thirty minutes and then lies down and sleeps for another couple of hours. Plaintiff testified that she watches more television for two or three hours upon waking and then falls asleep again for another two or three hours. Plaintiff testified that she goes to bed at night around 8:30 or 9:00 p.m. (Tr. 299-302.) Plaintiff testified that her children take care of the house. (Tr. 298.) Plaintiff testified that she does not clean the house, sweep or vacuum, and will sometimes wash the dishes if she is sitting down. Plaintiff testified that she does very little cooking. (Tr. 303.) Plaintiff testified that her daughter does the laundry and goes grocery shopping for her. Plaintiff testified that she will sometimes go to the store if she needs only a couple things. (Tr. 298.) Plaintiff testified that she can carry grocery bags if they are light. (Tr. 299.)

### III. Medical Records

On July 24, 2002, x-rays were taken of plaintiff's left hand and lumbar spine after plaintiff was involved in a motor vehicle accident. The x-ray of the hand was negative. The x-ray

of the lumbar spine showed a straightening lordotic curve with minimal degenerative osteophyte formation. There was no evidence of fracture or dislocation. (Tr. 239.)

On September 26, 2002, plaintiff visited Dr. Mitchell Mirbaha for complaints of right knee pain. Plaintiff reported that she had experienced such pain since the accident in July 2002. Plaintiff reported that she had taken medication and had participated in physical therapy with no real improvement. Dr. Mirbaha noted plaintiff to have good range of motion about the knee. Dr. Mirbaha observed plaintiff to be somewhat obese. X-rays taken of both knees that same date showed marked osteoarthritic changes in both knees with osteophyte formation. Plaintiff reported having no pain in the left knee. (Tr. 248, 251.) Dr. Mirbaha questioned whether plaintiff had a torn meniscus and an MRI was ordered. (Tr. 248.)

An MRI of the right knee taken on September 30, 2002, showed small joint effusion and an eight-mm osteochondral defect in the mid-patella. (Tr. 249, 250.)

On October 3, 2002, plaintiff reported to Dr. Mirbaha that the pain in her right knee persisted. Tenderness was noted about the knee. Dr. Mirbaha recommended that plaintiff undergo arthroscopic surgery on the knee for further evaluation and treatment of the pain. (Tr. 250, 251.)

Plaintiff underwent arthroscopic surgery on the right knee on October 24, 2002, at which time chondroplasty of the patella was performed and a large osteophyte was removed. Shaving

of the partially torn anterior horn of the medial meniscus was also done.  (Tr. 231-33, 250.)  Plaintiff was diagnosed with mild chronic synovitis of the right knee.  (Tr. 235.)  Demerol[1] and Vistaril[2] were prescribed for pain.  (Tr. 248.)

Plaintiff returned to Dr. Mirbaha on November 11, 2002, for follow up and reported that her right knee was better except that she was currently experiencing weakness.  Physical therapy was ordered for plaintiff.  Plaintiff also complained of pain in the left wrist and reported that she had had such pain since the accident in July 2002.  An x-ray of the left wrist taken that same date showed a possibility of a rotary subluxation of the scaphoid bone onto the lunate.  A follow up MRI study was recommended.  (Tr. 244.)

An MRI of the left wrist taken December 16, 2002, yielded negative results.  (Tr. 244.)

On December 30, 2002, plaintiff returned to Dr. Mirbaha and complained of having pain at the tip of the patella on the right knee.  Dr. Mirbaha noted there to be no crepidation, no effusion, and plaintiff had good range of motion.  The tender spot was injected with Depo-Medrol.[3]  (Tr. 244.)  Plaintiff was started

---

[1]Demerol is used to relieve moderate to severe pain.  Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682117.html>.

[2]Vistaril is used to relieve the itching caused by allergies and to control the nausea and vomiting caused by various conditions.  Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html>.

[3]Depo-Medrol is a corticosteroid injected to relieve inflammation.  Medline Plus (last reviewed Aug. 1, 2007)

on Celebrex.[4]  Plaintiff also reported that her wrist did not bother her as much as before, but that she currently had some pain about the left elbow and shoulder.  Dr. Mirbaha opined that, because plaintiff was a heavy person, the accident probably caused the musculature in plaintiff's left upper extremity to be stressed. Plaintiff was instructed to return in two weeks for follow up. (Tr. 242.)

On January 13, 2003, plaintiff did not appear for a scheduled appointment with Dr. Mirbaha.  (Tr. 244.)

Plaintiff returned to Dr. Mirbaha on January 16, 2003, and complained of persistent right knee pain.  Physical examination of the knee was unremarkable.  X-rays showed osteoarthritic changes and lateral tilting of the patella.  Plaintiff also complained of pain in the low back, left upper thigh and left wrist.  Dr. Mirbaha prescribed Vioxx[5] for plaintiff.  (Tr. 244.)

On February 27, 2003, plaintiff reported to Dr. Mirbaha that her right knee bothered her intermittently and that physical therapy had helped the condition.  Plaintiff also continued to complain of low back pain, neck pain, and numbness and tingling in the fingers of the left hand.  Dr. Mirhaba noted EMG studies

<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html>.

[4]Celebrex is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis and ankylosing spondylitis.  Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html>.

[5]Vioxx is indicated for the relief of signs and symptoms of osteoarthritis and for the management of acute pain.  Physicians' Desk Reference 2049-50 (55th ed. 2001).

performed January 17 to show mild median neuropathy.  Dr. Mirbaha
explained to plaintiff that she did not need much further treatment
for her knee.  Plaintiff was instructed to continue with her
exercises and with physical therapy.  (Tr. 242.)  Dr. Mirbaha
discharged plaintiff from further treatment and instructed
plaintiff to return as needed if she had any problems with her
knee.  (Tr. 241.)

       On June 17, 2003, plaintiff visited Neurologist Faisal J.
Albanna for her complaints of neck pain and low back pain.  (Tr.
207-13.)  Plaintiff reported her pain to be at a level seven on a
scale of one to ten.  (Tr. 213.)  Plaintiff reported that she had
experienced such pain since the accident in July 2002.  It was
noted that plaintiff was a driver of one of the vehicles involved
in the accident.  Plaintiff reported her neck pain to radiate to
both arms, greater on the left than the right.  Plaintiff denied
any numbness, weakness or tingling into the arms.  Plaintiff
reported her low back pain to radiate into the buttocks and
posterior thighs.  Plaintiff reported the pain to worsen with
prolonged sitting, standing and driving.  Plaintiff reported that
previous physical therapy and cervical traction did not help her
condition.  Plaintiff reported that her current medication,
Percocet,[6] seemed to help.  Physical examination showed plaintiff
to have full range of motion of the cervical spine.  Tenderness was

_____
       [6]Percocet contains oxycodone and acetaminophen and is used to
relieve moderate to severe pain.  Medline Plus (last reviewed Aug.
1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.
html>.

noted about the spinous processes of the lower cervical spine. No significant paraspinal muscle spasming or spasming of the trapezius muscles was noted. Plaintiff had full range of motion of the lumbosacral spine with pain upon left lateral bending. No tenderness or spasming was noted about the spine. Plaintiff's gait and station were noted to be full and steady, and plaintiff could heel and toe walk without difficulty. Straight leg raising was negative. Muscle strength was noted to be 5/5 in the upper and lower extremities; tone was within normal limits; and sensation was intact. MRI's obtained in February 2003 were reviewed, and Dr. Albanna noted current x-rays to show cervical spurs at C5-C6, C6-C7 and a mild degree of disc degeneration of the lumbosacral spine at L4-L5, L5-S1. Dr. Albanna diagnosed plaintiff with cervicalgia; cervical spondylosis at C5-C6 and C6-C7; lumbago; disc degeneration at L4-L5 and L5-S1; and spinal stenosis on the left at L4-L5 and foraminal stenosis on the left at L4-L5. (Tr. 207.) Dr. Albanna recommended that plaintiff participate in physical therapy as well as have epidural steroid injections administered. It was determined that plaintiff would undergo such treatment prior to any further analysis. (Tr. 208.)

On June 26, 2003, plaintiff underwent evaluation for physical therapy. Plaintiff complained of constant pain in her neck and between the shoulder blades with some radiation into the head and right arm. Plaintiff also complained of low back pain with radiation into both legs. Plaintiff reported her pain to be greater in the morning and to be aggravated by walking, standing,

and sitting without support. Plaintiff reported that sitting with support improved her symptoms. Plaintiff participated in physical therapy that same date and tolerated the treatment well. Plaintiff's prognosis was noted to be good with continued physical therapy. Plaintiff was instructed to participate in physical therapy three times a week for four weeks. (Tr. 206.)

Between June 26 and July 24, 2003, plaintiff participated in physical therapy on ten occasions. (Tr. 200-05.) Upon the conclusion of the prescribed therapy, it was reported that plaintiff had progressed with treatment for her low back pain, but that she had increased neck pain which worsened with treatment. Plaintiff was instructed on a home exercise program and was discharged from therapy. (Tr. 200.)

On July 28, 2003, plaintiff visited Dr. Alexander Beyzer of Albanna Neurosurgical Consultants and complained of residual pain in her neck and shoulders. It was noted that plaintiff took Percocet and ibuprofen for the pain and that her pain was at a level eight on a scale of one to ten. Physical examination showed some tenderness over the cervical area and the upper trapezius muscles. Plaintiff had full range of motion. The remainder of the examination was unremarkable. Plaintiff was diagnosed with cervicalgia and myofascial pain. Dr. Beyzer recommended that plaintiff discontinue ibuprofen and take Vioxx instead. Dr. Beyzer also recommended chiropractic manipulation and a trial of a TENS unit. Plaintiff was instructed to return for follow up in several weeks. Dr. Beyzer opined that plaintiff may need a trigger point

injection.  (Tr. 199.)

Plaintiff returned to Dr. Beyzer on August 11, 2003, and was administered a trigger point injection of Depo-Medrol to the left upper trapezius muscle.  Plaintiff was instructed to apply ice to the area as well as an interferential muscle stimulator. Plaintiff was to return in four weeks for follow up.  (Tr. 198.)

An adenosine cardiolite stress test performed on October 2, 2003, in response to plaintiff's complaints of shortness of breath and chest pain yielded essentially normal results, with somewhat increased left ventricular volume noted.  (Tr. 187-88.)

Plaintiff visited Dr. Tshiswaka B. Kayembe on October 16, 2003, for evaluation of plaintiff's complaints of shortness of breath.  Plaintiff complained of palpitations and shortness of breath when walking uphill.  Plaintiff was noted to have elevated blood pressure.  Plaintiff's current medication was noted to include Effexor.[7]  Physical examination was unremarkable. Plaintiff's weight was noted to be 310 pounds.  Dr. Kayembe determined for plaintiff to undergo an echocardiogram.  Plaintiff was prescribed Hydrochlorothiazide (HCTZ)[8] and Triamterene.[9]  (Tr.

_____

[7]Effexor is used to treat depression.  Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a694020.html>.

[8]Hydrochlorothiazide is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease.  Medline Plus (last reviewed Aug. 1, 2007)<http: //www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html>.

[9]Triamterene is used to treat edema caused by various conditions, including liver and heart disease.  Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a682337.html>.

185-86.)

An echocardiogram performed on October 30, 2003, yielded normal results.  (Tr. 184.)

Plaintiff returned to Dr. Kayembe on January 8, 2004, who noted plaintiff's only complaint to be of heartburn.  Plaintiff experienced no chest pain.  Physical examination was noted to be unchanged.  Plaintiff was diagnosed with heartburn, controlled hypertension, obesity, and hyperlipidemia.  Plaintiff was instructed to continue with over-the-counter H2 blocker or proton pump inhibitor and to follow up in four months.  (Tr. 183.)

Plaintiff returned to Dr. Kayembe on May 26, 2004, who noted plaintiff to have done well since her last visit and to have no particular complaint.  Plaintiff was noted to weigh 305 pounds. Dr. Kayembe noted plaintiff's current medications to include Paxil[10] and Triamterene.  Physical examination was unremarkable.  Plaintiff was diagnosed with atypical chest pain and obesity, and was instructed to continue with the same medical regimen and to follow up in six months.  (Tr. 181-82.)

Plaintiff visited Dr. Denise Buck on August 12, 2004, and complained of shortness of breath, nocturia and orthopnea.  Dr. Buck determined to order pulmonary function tests.  (Tr. 171.)

An x-ray taken of plaintiff's chest on August 17, 2004, in response to plaintiff's complaints of shortness of breath was negative.  (Tr. 238.)

_____

[10]Paxil is used to treat depression, panic disorder and social anxiety disorder.  Medline Plus (last revised Feb. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html>.

On August 24, 2004, plaintiff visited Dr. Beyzer and complained of neck pain. Plaintiff reported that the pain had been aggravated a week prior with pain radiating to her shoulder. Plaintiff described the pain as moderate, at a level five or six on a scale of one to ten. Plaintiff also complained of low back pain and reported that standing and walking aggravate the pain. Dr. Beyzer noted that physical therapy provided no significant relief in the past. Plaintiff's current medications were noted to include Flexeril,[11] Darvocet[12] and Paxil without significant improvement. Physical examination showed range of motion of the cervical spine to be slightly limited to the left. Palpation of the lumbosacral spine showed no tenderness. Plaintiff had full range of motion of the lumbosacral spine. Straight leg raising was negative. Neurological examination was unremarkable. Dr. Beyzer noted MRI's to show spur at the cervical spine at C5-C6, C6-C7 and degenerative disc at the lumbar spine at L4-L5, L5-S1. Plaintiff was diagnosed with lumbago secondary to degenerative disc L4-L5, L5-S1; cervicalgia; and cervical spondylosis. Noting plaintiff not to have responded to physical therapy or to interferential muscle stimulation, Dr. Beyzer recommended a trial of cervical epidural steroid injections and a trial of aquatic physical therapy.

---

[11]Flexeril is a muscle relaxant used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html>.

[12]Darvocet is used to relieve mild to moderate pain. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682325.html>.

Plaintiff was instructed to return in three to four weeks.  (Tr. 197.)

On September 23, 2004, plaintiff reported to Dr. Buck that her shortness of breath was about the same.  Dr. Buck discussed air trapping with plaintiff and prescribed Advair.[13]  (Tr. 169.)

On November 4, 2004, plaintiff reported to Dr. Buck that Advair seemed to help initially with her shortness of breath but that she was starting to experience it again.  Plaintiff reported that such shortness of breath usually occurred with activity and rarely at rest.  Plaintiff was referred to a pulmonary specialist. (Tr. 168.)

On November 4, 2004, plaintiff visited Dr. Kayembe who noted plaintiff not to experience chest pain or tightness. Plaintiff complained of some lower back pain which she reported to occur usually when lying down in bed.  Dr. Kayembe noted Advair not to significantly improve plaintiff's condition.  Dr. Kayembe described plaintiff as having atypical chest pain and shortness of breath.  Dr. Kayembe noted plaintiff's hypertension to be very well controlled.  Plaintiff was instructed to maintain her medical regimen and weight reduction program and to return in six months for follow up.  (Tr. 180.)

Plaintiff visited Dr. Shyam S. Ivaturi on December 1,

_____

[13]Advair is used to prevent wheezing, shortness of breath and breathing difficulties caused by asthma and chronic obstructive pulmonary disease.  Medline Plus (last revised Nov. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699063.html>.

2004, for an initial pulmonary consultation in relation to plaintiff's complaints of shortness of breath. (Tr. 174-76.) Dr. Ivaturi noted plaintiff's history of depression and hypertension. Plaintiff reported that she had been experiencing shortness of breath during the previous six to eight months, both with exertion and at rest. Plaintiff reported that Albuterol[14] and Advair provided little or no relief. Plaintiff reported sometimes feeling tired upon waking and increased daytime sleepiness. (Tr. 174.) Dr. Ivaturi noted plaintiff's current medications to include Celebrex, Paxil, HCTZ, and Advair. Plaintiff denied any chest pains or palpitations. Dr. Ivaturi noted plaintiff to have a congenital deformity of the right arm since birth with the right hand having only three fingers. Plaintiff reported occasional joint pain. Physical examination showed plaintiff to weigh 312 pounds and to appear "distantly obese." Respiratory examination was unremarkable. (Tr. 175.) Dr. Ivaturi noted recent pulmonary function tests to be suggestive of mild air trapping. Plaintiff was diagnosed with shortness of breath; daytime hypersomnolence, without obstructive sleep apnea or sleep related disorder; and obesity. Dr. Ivaturi recommended that plaintiff undergo additional pulmonary function tests to rule out hyperactive airways, such as asthma; undergo a sleep study; and lose weight. Plaintiff was instructed to continue on her current medications and to return in

---

[14]Albuterol is used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease. Medline Plus (last revised Mar. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a607004.html>.

eight weeks for follow up.  (Tr. 176.)

On December 7, 2004, plaintiff was admitted to St. Anthony's Medical Center for a sleep study.  (Tr. 216-30.) Plaintiff was noted to have a history of depression.  Plaintiff currently complained of excessive daytime sleepiness and tiredness. Plaintiff was noted to be overweight.  It was suspected that plaintiff experienced sleep apnea.  (Tr. 216.)  Upon conclusion of the study, plaintiff was diagnosed with mild to moderate obstructive sleep apnea.  (Tr. 217.)  It was recommended that plaintiff use nasal air or nasal pillows with a CPAP machine to avoid feelings of claustrophobia with the mask.  It was also recommended that plaintiff lose weight, exercise and continue treatment for depression.  (Tr. 218.)

Plaintiff visited Dr. Beyzer on March 15, 2005, and complained of persistent neck pain and of numbness and tingling in the left arm.  Plaintiff reported most of her pain to be on the left side.  Plaintiff reported that Celebrex, Darvocet and Vicodin[15] did not help the pain.  Plaintiff reported taking Aleve which likewise did not help the pain.  Physical examination showed tenderness upon palpation at the cervical paraspinals on the left. Plaintiff had full range of motion.  Spurling sign was positive on the left.  Neurological examination was unremarkable.  Dr. Beyzer noted there to be a deformity over the right forearm.  An x-ray of

---

[15]Vicodin is a combination of hydrocodone and acetaminophen used to relieve moderate to severe pain.  <u>Medline Plus</u> (last revised Oct. 1, 2008)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/</u> meds/a601006.html>.

the cervical spine taken that same date showed cervicalgia and cervical spondylosis and plaintiff was diagnosed with same. Dr. Beyzer recommended that plaintiff undergo additional diagnostic testing. Percocet was prescribed. (Tr. 196.)

An MRI of the cervical spine obtained March 21, 2005, showed C3-C4 and C4-C5 left paracentral disc protrusions with C5-C6 and C6-C7 diffuse posterior disc bulge and spurring; ventral cord flattening at the C5-C6 level with mild central canal stenosis; and mild foraminal stenosis at C3-C4, C4-C5, C5-C6, and C6-C7 due to uncovertebral and facet spurring. (Tr. 194.)

On March 29, 2005, plaintiff underwent a nerve conduction study which showed moderate carpal tunnel syndrome on the left side. No evidence suggestive of cervical radiculopathy on the left side was noted. (Tr. 192.)

Plaintiff returned to Dr. Albanna on March 29, 2005, and complained of neck pain, headaches, left upper extremity pain, and numbness and tingling into the left upper extremity to the middle finger. Plaintiff reported the condition to worsen with lying down. It was noted that previous treatment modalities provided no relief. Plaintiff reported that she felt quite limited by her symptoms. Physical examination showed decreased range of motion of the cervical spine in all directions. The remainder of the examination was unremarkable. Dr. Albanna reviewed the results of the recent diagnostic tests and diagnosed plaintiff with cervical spondylosis at C5-C6 and C6-C7. Dr. Albanna recommended that plaintiff undergo a cervical myelogram in possible preparation for

anterior cervical microdiscectomy, fusion and stabilization. Noting plaintiff's allergy to dye, Dr. Albanna determined to provide plaintiff with Medrol Dosepak as a prophylactic prior to the myelogram.  (Tr. 190.)

Plaintiff returned to Dr. Kayembe on June 30, 2005, who noted plaintiff to have done well over the past several months with no chest pain.  Plaintiff weighed 312 pounds.  Plaintiff was noted to have a history of depression.  Dr. Kayembe diagnosed plaintiff with resolved chest pain, controlled hypertension, obesity, and depression.  Plaintiff was instructed to continue on her current regimen and to return in six months.  (Tr. 179.)

On June 20, 2005, plaintiff visited Dr. Buck and reported that she no longer experienced shortness of breath.  Plaintiff complained of pain in her neck and back and reported that she needed a myelogram.  Plaintiff reported that Darvocet and Vicodin did not help.  Plaintiff also reported that Paxil did not work as well as Paxil CR.  Upon physical examination, plaintiff was diagnosed with dermatitis, stress incontinence, depression, and neck pain.  Plaintiff was instructed to change back to Paxil CR when it became available.  Percocet was prescribed.  Plaintiff was instructed to return in two months for follow up.  (Tr. 167.)

On July 11, 2005, Dr. Ivaturi reported to disability determinations that plaintiff had been diagnosed with shortness of breath and mild obstructive sleep apnea.  (Tr. 173.)

On July 12, 2005, Dr. Buck reported to disability determinations that plaintiff had been diagnosed with hypertension,

depression, obstructive sleep apnea, birth defect of the right arm, degenerative disc disease, and left carpal tunnel. (Tr. 166.)

On August 23, 2005, plaintiff underwent a consultative psychiatric examination for disability determinations. (Tr. 160-64.) Plaintiff complained to Dr. Georgia Jones of depression, bulging disc, hypertension, heel spurs, shortness of breath, arthritis, missing two fingers on the right hand, and right arm unable to be straightened. Dr. Jones noted plaintiff's current medications to include Percocet, Trazodone,[16] HCTZ, and Paxil. Plaintiff reported that the last time she saw a psychiatrist regularly was in 2000 when her husband lost his job and she had no insurance. Plaintiff reported that she currently had difficulty falling and staying asleep. (Tr. 160.) Plaintiff reported feeling sad, blue, hopeless, helpless, and worthless. Plaintiff reported having poor memory, decreased focus and concentration, and irritability. Plaintiff reported that she only enjoyed seeing her grandchildren whom she saw daily. Plaintiff reported that she and her husband recently separated. Plaintiff reported having fleeting thoughts of suicide but had no intent or plan. Plaintiff reported that she last worked for three days in 1994 and left because she could not handle it. Plaintiff reported that she believed her low self esteem prevented her from being employed. Plaintiff reported that she last used marijuana six months prior and cocaine one year prior. (Tr. 161.) Plaintiff reported having withdrawal symptoms

_____

[16]Trazodone is used to treat depression. Medline Plus (last revised Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

but never had treatment for or legal problems on account of her drug use. Mental status examination was unremarkable. Plaintiff's affect was noted to be appropriately reactive. Sensorium examination was unremarkable. (Tr. 161-62.) Plaintiff's social functioning, appearance and ability to care for personal needs were noted to be intact. Dr. Jones noted plaintiff to have a driver's license. Plaintiff's concentration, persistence and pace were noted to be good throughout the examination. Upon conclusion, Dr. Jones diagnosed plaintiff with dysthymia with superimposed episodes of major affective disorder and depression. Dr. Jones assigned plaintiff a Global Assessment of Functioning (GAF) score of 70. Dr. Jones determined plaintiff's prognosis from a psychiatric standpoint to be good. (Tr. 163.)

On August 23, 2005, plaintiff underwent a consultative physical examination for disability determinations. (Tr. 153-59.) Plaintiff complained to Dr. Clodualdo Gamez of neck pain, carpal tunnel syndrome, back and leg pain, and depression. With respect to her neck pain, plaintiff reported that surgery had been recommended but that she was not given any assurance that the surgery would definitely help her pain. Plaintiff reported that the pain radiated to her arms and was getting progressively worse. Plaintiff reported that she could not lift heavy objects with her left upper extremity due to pain and was disabled with her right upper extremity due to a congenital anomaly in development. Plaintiff reported her carpal tunnel syndrome to have worsened over the previous two months. (Tr. 153.) Plaintiff reported that no

treatment, such as a wrist brace or surgery, had been recommended for the condition and that pain medication had not been helpful. (Tr. 153-54.) Plaintiff reported her back pain to radiate to both legs. Plaintiff reported that Percocet had provided some relief but that her physician recently referred her to a pain specialist and stopped prescribing the medication due to the potential for dependence. As to her depression, plaintiff reported that she had suffered from the condition since childhood and took medication, but that the medication was not of much help. Dr. Gamez noted plaintiff's current medications to include Triamterine, Paxil CR and Percocet. Plaintiff reported a "distant history of illicit drug use at a much earlier age" and that she had "kicked" the habit. Dr. Gamez observed plaintiff to be morbidly obese. Plaintiff was depressed and tearful during the examination. Physical examination showed plaintiff to stand five feet, six inches tall and to weigh 311 pounds. (Tr. 154.) Examination of the back showed no tenderness or muscle spasm. Distal pulses were noted to be slightly diminished to palpation in all four extremities. A congenital anomaly of the right arm was noted with a lateral curvature of the humerus bone distally and an absence of thumb and fifth finger on the right hand. Dr. Gamez reported plaintiff's other extremities to be essentially normal. Range of motion was noted to be diminished about the right shoulder. Elbow joints were normal and wrist examination was normal. (Tr. 155.) Dr. Gamez was unable to detect any signs or symptoms of carpal tunnel. (Tr. 156.) Range of motion about the knees was

essentially normal. Overall muscle strength in the upper extremities was normal, although plaintiff had diminished ability to make a fist and grip with her right hand. Range of motion of the hips was slightly diminished, as was range of motion of the cervical and lumbar spine. Straight leg raising was normal. Plaintiff was observed to ambulate without difficulty, to be able to get on and off the examination table without difficulty, and to be able to dress herself without assistance. Neurological examination was normal. (Tr. 155.)

In a Mental Residual Functional Capacity Assessment completed September 22, 2005, by Medical Consultant J. McGee with disability determinations, it was opined that, in the domain of Understanding and Memory, plaintiff was not significantly limited in her ability to remember locations and work-like procedures, or to understand and remember very short and simple instructions. It was further opined that plaintiff was moderately limited in her ability to understand and remember detailed instructions. In the domain of Sustained Concentration and Persistence, it was opined that plaintiff was not significantly limited in her ability to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary work routine without special supervision; to work in coordination with or proximity to others without being distracted by them; or to make simple work-related decisions. It was further opined that plaintiff was moderately limited in her ability to carry out

detailed instructions; to maintain attention and concentration for extended periods; and to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonably number and length of rest periods. In the domains of Social Interaction and Adaptation, it was opined that plaintiff was not significantly limited in any regard. (Tr. 87-90.)

On September 27, 2005, plaintiff reported to Dr. Buck that her depression was getting worse. Plaintiff also reported that she was worried about weight gain and was in constant pain with no good days. Plaintiff was diagnosed with chronic pain, major depression and stress incontinence. Plaintiff was prescribed Detrol[17] and was instructed to follow up in six weeks. (Tr. 144.)

Plaintiff returned to Dr. Buck on December 28, 2005. Dr. Buck noted plaintiff's current medications to be Paxil CR and Restoril.[18] Plaintiff was diagnosed with insomnia and depression and was given Ambien. (Tr. 143.)

On March 8, 2006, plaintiff complained to Dr. Buck of having experienced headaches, blurred vision, and tenderness at the base of her scalp at the back of her head. Dr. Buck noted plaintiff to have a history of hypertension which was stable.

---

[17]Detrol is used to relieve urinary difficulties. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699026.html>.

[18]Restoril is used on a short-term basis to treat insomnia. Medline Plus (last revised Oct. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684003.html>.

Plaintiff was prescribed Naprosyn[19] for pain and a CT scan of the head was ordered.  (Tr. 142.)

A CT scan of the head obtained March 9, 2006, in response to plaintiff's complaints of headaches showed previous mastoid surgery on the left.  The CT scan was otherwise unremarkable.  (Tr. 147.)

On March 29, 2006, plaintiff returned to Dr. Beyzer and complained of persistent, moderate neck pain radiating to her left arm and shoulder.  Dr. Beyzer noted plaintiff's last visit to have been in March 2005.  Plaintiff reported no numbness, tingling or weakness.  Plaintiff also complained of back pain but reported that it was not as severe as her shoulder pain.  It was noted that plaintiff was taking Vicodin for pain.  Physical examination showed some tenderness of the left upper trapezius and limited range of motion to the left.  Spurling's test was positive on the left.  The remainder of the examination was unremarkable.  Plaintiff was diagnosed with cervical spondylosis and was given Lidoderm patches.[20]  Dr. Beyzer recommended an additional MRI of the cervical spine with neurosurgical consultation thereafter.  (Tr. 152.)

An MRI of the cervical spine obtained on April 5, 2006,

_____

[19]Naprosyn is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis and ankylosing spondylitis.  Medline Plus (last reviewed Aug. 1, 2007) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html>.

[20]Lidoderm patches are used to relieve the pain of post-herpetic neuralgia (the burning, stabbing pains or aches that may last for months or years after a shingles infection).  Medline Plus (last reviewed May 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603026.html>.

- 27 -

showed central disc bulge/protrusion at C3-4 with flattening of the ventral cord and mild central canal stenosis. Lateralizing osteophyte C5-6 and C6-7 with resulting foraminal stenosis and probable mild central canal stenosis was also noted. (Tr. 151A.)

An x-ray of the chest taken June 5, 2006, in response to plaintiff's complaints of chest pain showed no evidence of acute cardiopulmonary process. (Tr. 146.) Myocardial perfusion imaging showed reversible apical perfusion defect consistent with exercise-induced ischemia. (Tr. 145.)

Cardiac catheterization laboratory tests performed on June 8, 2006, showed non-obstructive coronary artery disease. (Tr. 139-40.)

On June 15, 2006, plaintiff visited Dr. Barbara O'Brien who observed plaintiff to move all of her extremities well and to exhibit full range of motion of the extremities. (Tr. 133.)

Plaintiff returned to Dr. Beyzer on June 21, 2006, and complained of pain in her neck and left shoulder that was sometimes moderate to severe. Dr. Beyzer noted plaintiff not to be taking any medication and that she "has been off work." Physical examination showed range of motion to be limited. Spurling's sign was negative. No tenderness was noted upon palpation. Neurological examination was normal. Upon review of the recent MRI, Dr. Beyzer diagnosed plaintiff with cervicalgia, cervical spondylosis, and cervical radiculitis at C5-C6 and C6-C7. It was recommended that plaintiff take Naprosyn and use Lidoderm patches, and that she receive epidural steroid injections and chiropractic

modalities.  (Tr. 151.)

On August 25, 2006, plaintiff visited Psychiatrist Shazia Malik.  Plaintiff reported that she was not doing well and was having terrible difficulty.  Plaintiff reported that she could not get "caught up."  Plaintiff reported that she worried about her grandchildren.  Plaintiff reported that she felt down, had low energy and motivation, and liked to sleep a lot.  Dr. Malik prescribed Wellbutrin,[21] Lamictal[22] and Symbyax[23] for plaintiff. (Tr. 127.)

On September 5, 2006, plaintiff complained to Dr. Mirbaha of having experienced severe bilateral knee pain for two days. Plaintiff reported the left knee to be more painful than the right. Dr. Mirbaha noted x-rays to show a marked degree of osteoarthritic changes in the knees, "but amazingly, the symptoms are minimal for the amount of osteoarthritis she has in the knees."  Dr. Mirbaha administered an injection of Cortisone to both knees and gave plaintiff a prescription for Indocin.[24]  (Tr. 129.)

---

[21]Wellbutrin is used to treat depression.  Medline Plus (last revised Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a695033.html>.

[22]Lamictal is used to increase the time between episodes of depression, mania and other abnormal moods in patients with bipolar disorder.  Medline Plus (last revised June 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html>.

[23]Symbyax is used to to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks.  Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a689006.html>.

[24]Indocin is used to relieve moderate to severe pain as well as tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis and ankylosing spondylitis.  Medline Plus

On September 12, 2006, plaintiff cancelled a scheduled appointment with Dr. Mirbaha. (Tr. 130.)

Plaintiff returned to Dr. Malik on October 6, 2006, and reported feeling down, lacking energy and of not wanting to do anything. Plaintiff reported feeling no different after having taken Wellbutrin for one and a half months. Plaintiff reported that she "got fired from the job." Plaintiff complained of increased anxiety and reported that she felt hot, clammy, nervous, and claustrophobic at times. Dr. Malik instructed plaintiff to take Cymbalta,[25] Lamictal and Symbyax and to return in four weeks. (Tr. 125.)

In an undated Physical Residual Functional Capacity Assessment completed by Disability Examiner A. Cooke, it was opined that plaintiff could lift twenty pounds occasionally and ten pounds frequently, could stand and/or walk a total of about six hours in an eight-hour workday, could sit for a total of about six hours in an eight-hour workday, and had unlimited ability to push and/or pull. It was further opined that plaintiff could frequently balance, stoop, kneel, and crouch; could occasionally crawl; and could never climb ladders, ropes or scaffolds. It was further opined that plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 91-98.)

_____

(last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681027.html>.

[25]Cymbalta is used to treat depression and generalized anxiety disorder. Medline Plus (last revised Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html>.

## IV.  The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity at any time relevant to the decision. The ALJ found plaintiff's degenerative disorders of the spine, osteoarthritis of the knees, carpal tunnel syndrome, and non-obstructive coronary artery disease to be severe impairments but that such impairments, either singly or in combination, did not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4.  The ALJ found plaintiff's allegations of total inability to work not to be fully credible. The ALJ determined plaintiff to have the residual functional capacity (RFC) to lift and/or carry ten pounds, both frequently and occasionally; sit for about six hours out of an eight-hour workday; stand and/or walk for about two hours in an eight-hour workday; and was unlimited in her ability to push and/or pull.  The ALJ determined such RFC to be consistent with the ability to perform the full range of sedentary work.  Considering plaintiff's age, limited education, RFC, and no past relevant work experience, the ALJ determined that Medical-Vocational Rule 201.24 directed a finding of not disabled.  Finding plaintiff able to make a vocational adjustment to work which exists in significant number in the national economy, the ALJ determined plaintiff not to be under a disability at any time through the date of the decision.  (Tr. 15-17.)

## V.  Discussion

To be eligible for Supplemental Security Income under the

Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the

impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ erred in failing to consider the deformity of plaintiff's right arm and hand and in failing to find such deformity to be a severe impairment. Plaintiff also claims that the ALJ erred in his RFC determination by failing to consider plaintiff's impairments in combination, and especially the condition of plaintiff's right arm and her non-exertional impairments of obesity and depression. Plaintiff also contends that the ALJ erred in his adverse credibility determination. Finally, plaintiff argues that the ALJ erred by relying on the

Medical-Vocational Guidelines in finding plaintiff not to be disabled inasmuch as plaintiff suffers from non-exertional impairments that should be considered by a vocational expert.

A.  Credibility Determination

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility.  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).  In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).  Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole.  Id.

Where, as here, a plaintiff contends on judicial review that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible."  Masterson v. Barnhart, 363

F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001); see also Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. Tellez, 403 F.3d at 957; Pearsall, 274 F.3d at 1218.

Invoking Polaski, the ALJ here identified what he determined to be inconsistencies in the record to support his conclusion that plaintiff's subjective complaints of pain were not credible. Upon review of the record as a whole, however, it cannot be said that the ALJ's adverse credibility determination is supported by substantial evidence.

In finding plaintiff's subjective complaints not to be credible, the ALJ first found it significant that plaintiff reported to the various examining physicians that her pain level was "only moderate in intensity." (Tr. 14.) The ALJ determined that "[s]uch a level of discomfort would not normally support a finding for disability." (Id.) A review of the ALJ's decision, however, shows the ALJ to have failed to acknowledge the substantial evidence in the record showing that among other treatment modalities, plaintiff had been prescribed significant

narcotic medication for the relief of moderate to severe pain as well as a muscle relaxant used to relieve pain and discomfort. See Bowman v. Barnhart, 310 F.3d 1080, 1083 (8th Cir. 2002) (ALJ erred in credibility determination by finding claimant suffered only mild to moderate pain when record showed medication was prescribed for moderate to moderately severe pain). There is no evidence in the record demonstrating that such medication was effective in treating plaintiff's pain and, indeed, the treatment notes continually report the ineffectiveness of plaintiff's medication. The plaintiff's report to her physicians that she continued to experience moderate pain despite taking narcotic pain medication prescribed for moderate to severe pain does not serve to discredit plaintiff's complaints of pain.

The ALJ also found that plaintiff's treatment with only conservative modalities was inconsistent with disabling pain and, further, that the record "fail[ed] to evidence the claimant as being a surgical candidate relative to any [of] her physical impairments." (Tr. 14.) The ALJ stated that, instead, the primary recommendation in treating plaintiff was exercise and weight reduction. (Id.) Contrary to the ALJ's finding, the record shows that surgery had indeed been considered for plaintiff's cervical impairment and recommendations were made to prepare for possible surgery. Although plaintiff's allergy to preparation materials and her uncertainty as to the success of such proposed procedure resulted in surgery having not occurred, the ALJ's statement that the record revealed no evidence of plaintiff being a surgical

candidate is inaccurate.  In addition, the record shows plaintiff to have continually been prescribed strong narcotic pain medication and to have received epidural steroid injections for her pain with only limited relief.  To state that the recommended treatment for plaintiff's condition consisted primarily of exercise and weight reduction is contrary to the record.  The ALJ's unfounded skepticism regarding plaintiff's treatment regimen is an insufficient basis upon which to find plaintiff's complaints not credible, especially where no medical report suggests that plaintiff had not been pursuing a valid course of treatment.  See Bowman, 310 F.3d at 1084 (quoting Tate v. Apfel, 167 F.3d 1191, 1197 (8th Cir. 1999)).

The ALJ also determined that plaintiff's daily activities and poor work history detracted from her credibility. Specifically, the ALJ found that plaintiff's ability to care for her grandchildren, perform certain household chores, drive, prepare simple meals, shop in stores, and manage money was inconsistent with a physical or mental incapacity to perform work.  Disability under the Social Security Act, however, does not mean total disability or exclusion from all forms of human and social activity.  The ability to shop, clean, do laundry, and visit with others does not constitute substantial evidence that a claimant can engage in substantial gainful activity.  See Harris v. Secretary of the Dep't of Health & Human Servs., 959 F.2d 723, 726 (8th Cir. 1992); see also Burnside v. Apfel, 223 F.3d 840, 845 (8th Cir. 2000) (mowing lawn, tinkering on old cars, woodworking, feeding

children's pets, occasional cooking, driving, running errands, and grocery shopping does not demonstrate claimant able to return to work); Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) (ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work). But see Wagner, 499 F.3d at 852 (fixing meals, doing housework, grocery shopping, and visiting friends considered to be "extensive" daily activities). "A claimant need not be bedridden to qualify for disability benefits." Burnside, 223 F.3d at 845. Nevertheless, to the extent the ALJ considered plaintiff's daily activities and poor work record to constitute inconsistencies in the record, such inconsistencies do not rise to the level of substantial evidence on the record as a whole to support the ALJ's decision to discount plaintiff's testimony. See Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998). This is especially true here where many of the alleged inconsistencies upon which the ALJ relied to discredit plaintiff's subjective complaints are not supported by, and indeed in some instances are contrary to, the record. Such discrepancies undermine the ALJ's ultimate conclusion that plaintiff's symptoms are less severe than she claims. Baumgarten v. Chater, 75 F.3d 366, 368-69 (8th Cir. 1996).

Finally, the undersigned notes that, with one exception relating to a November 2004 examination by Dr. Kayembe regarding plaintiff's shortness of breath, the ALJ's opinion is devoid of any discussion relating to any treatment sought by or rendered to plaintiff prior to August 2005, despite extensive evidence in the

record describing the signs and symptoms of plaintiff's impairments, diagnostic testing relating thereto, and treatment rendered therefor occurring at or near the time plaintiff applied for benefits in June 2005. Evidence relating to conditions that exist during the relevant time period must be considered in determining whether a claimant is disabled. Cf. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000). The ALJ here provides no explanation as to why multiple medical records dated prior to August 2005 which documented plaintiff's musculoskeletal impairment and related treatment were not considered in his determination of plaintiff's claim. Although an ALJ is not required to explain all the evidence of record, Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000), he nevertheless cannot merely "pick and [choose] only evidence in the record buttressing his conclusion." Taylor o/b/o McKinnies v. Barnhart, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004), and cases cited therein.

> The ALJ may have considered and for valid reasons rejected the . . . evidence proffered . . . ; but as he did not address these matters, we are unable to determine whether any such rejection is based on substantial evidence. Initial determinations of fact and credibility are for the ALJ, and must be set out in the decision; we cannot speculate whether or why an ALJ rejected certain evidence. Accordingly, remand is necessary to fill this void in the record.

Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995) (citation omitted).

In light of the above, it cannot be said that the ALJ demonstrated in his written decision that he considered all of the

evidence relevant to plaintiff's complaints or that the evidence he considered so contradicted plaintiff's subjective complaints that plaintiff's testimony could be discounted as not credible. Masterson, 363 F.3d at 738-39. As such, the ALJ's adverse credibility determination is not supported by substantial evidence on the record as a whole. Because the ALJ's decision fails to demonstrate that he considered all of the evidence before him under the standards set out in Polaski, this cause should be remanded to the Commissioner for an appropriate analysis of plaintiff's credibility in the manner required by and for the reasons discussed in Polaski.

B.    RFC Determination

Where an ALJ errs in his determination to discredit a claimant's subjective complaints of pain, the resulting RFC assessment is called into question inasmuch as it does not include all of the claimant's limitations. See Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001); Ross, 218 F.3d at 849-50. Plaintiff also claims that the ALJ's RFC determination is flawed inasmuch as it failed to consider plaintiff's depression and obesity.

1.    *Depression*

To the extent plaintiff contends that the ALJ failed to consider plaintiff's depression in his RFC determination, a review of the ALJ's decision shows the contrary. In his decision, the ALJ noted the scant treatment record relating to plaintiff's mental impairment and set out the detailed findings made by consulting psychiatrist Dr. Jones upon her extensive examination of plaintiff.

The ALJ specifically noted Dr. Jones' opinion that plaintiff was suffering only mild limitations in functioning. (Tr. 13.) The ALJ then underwent the analysis as required by 20 C.F.R. § 416.920a, made specific findings as to plaintiff's functional ability in each of the broad areas of functioning, and concluded plaintiff's mental impairment not to be severe. A review of the record as a whole shows this determination to be supported by substantial evidence.

2. *Obesity*

The record establishes that plaintiff suffers from obesity. Although obesity is no longer, in itself, a listed impairment, see Social Security Ruling (SSR) 02-1p, 2000 WL 628049 (S.S.A.), the Social Security Regulations specifically instruct that the cumulative effects of obesity must be considered with a claimant's other impairments. As specifically applicable in this case, § 1.00(Q) of the Listings provides for obesity to be considered in cumulation with impairments of the musculoskeletal system:

> Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, *including when assessing an individual's residual functional capacity,* adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. 404, Subpt. P, App. 1, § 1.00(Q). (Emphasis added.)

This same mandate applies when impairments of the cardiovascular system are present. 20 C.F.R. 404, Subpt. P, App. 1, § 4.00(F). As such, an ALJ errs when he fails to consider the impact of a claimant's obesity on her ability to perform work.

Although the ALJ here makes a passing reference to plaintiff's height and weight when summarizing the consultative examination performed by Dr. Gamez (Tr. 10), he otherwise does not mention plaintiff's obesity nor her multiple diagnoses of obesity, including Dr. Gamez's observation that plaintiff was "morbidly obese." The ALJ did not consider plaintiff's obesity at Step 2 of the sequential evaluation when identifying her severe impairments, and indeed did not include obesity as one of plaintiff's medically determinable impairments. The ALJ likewise did not consider plaintiff's obesity at Step 3 of the sequential evaluation when determining whether the combination of plaintiff's impairments met or equaled an impairment in the Listings. Nor did the ALJ address plaintiff's obesity at Step 4 when assessing her Residual Functional Capacity. This complete failure by the ALJ to consider the effects of plaintiff's diagnosed impairment of obesity at any step of the evaluation process runs afoul of the mandates of the Social Security Regulations and is especially egregious here, where plaintiff is determined to suffer from both musculoskeletal and cardiovascular impairments considered by the ALJ to be severe.[26]

---

[26]SSR 02-01p, 2000 WL 628049, reinforces the Regulation's mandate regarding obesity as follows: Step 2-"we will do an individualized assessment of the impact of obesity on an

The Social Security Administration recognizes that obesity may limit a person's exertional abilities (e.g., sitting, standing, walking, lifting, carrying, pushing, and pulling), ability to perform postural functions (e.g., climbing, balancing, stooping, and crouching), and ability to work on a regular and continuing basis.  SSR 02-1p, 2000 WL 628049 at *6.  "The combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."  Id.; see also Barrett v. Barnhart, 355 F.3d 1065, 1068 (7th Cir. 2004) ("Even if Barrett's arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both."); Gentle v. Barnhart, 430 F.3d 865, 868 (7th Cir. 2005) (noting potential effect of obesity on ability of person with disc disease to sit and stand).

The ALJ's failure to assess plaintiff's obesity at any step of the sequential evaluation resulted in a legally deficient

individual's functioning when deciding whether the impairment is severe . . .," id. at *4; Step 3-"Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.  We will evaluate each case based on the information in the case record . . .," id. at *5; Step 4-"The combined effects of obesity with other impairments may be greater than might be expected without obesity . . . .  As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitation . . .," id. at **6-7.

decision regarding plaintiff's ability to perform work-related activities. In light of this failure, it cannot be said that the ALJ's RFC determination is supported by substantial evidence on the record as a whole. Remand is thus required for proper consideration and evaluation of plaintiff's obesity, in combination with her other impairments, as required by Social Security Regulations and Ruling 02-1p. See also Brown v. Sullivan, 902 F.2d 1292, 1296 (8th Cir. 1990) (Commissioner to consider on remand the combined effect of the claimant's hypertension, obesity, and chronic obstructive pulmonary disease, together with degenerative musculoskeletal changes and the claimant's credible allegations of pain).

C.    Consideration of Plaintiff's Arm Deformity

        The medical evidence in the record shows that plaintiff suffers from a congenital deformity of the right arm in that she is missing the thumb and fifth finger of the right hand and has a lateral curve of the right humerus bone distally. In his written decision, the ALJ made only a passing reference to this deformity in his summary of the consultative examination performed by Dr. Gamez. (Tr. 10.) The ALJ did not address Dr. Gamez's related findings that plaintiff was limited in her ability to make a fist and to grip with the right hand on account of this deformity. Nor did the ALJ consider this medically determinable impairment in combination with plaintiff's other impairments to determine whether, and to what extent, plaintiff's ability to perform work-related functions may be limited thereby.

In his Brief in Support of the Answer, the Commissioner concedes that "it would have been preferable for the ALJ to find Plaintiff's congenital deformity to be a severe impairment" (Brief at p. 10) but argues that such failure was harmless inasmuch as plaintiff suffered from this impairment since birth but did not apply for disability benefits until she was forty-four years of age. This argument fails to recognize the duty of the ALJ to consider a claimant's impairments both singly *and in combination* when determining whether a claimant is disabled. The ALJ's failure to consider plaintiff's deformity and related limitations in any regard removed from his consideration whether such impairment, when considered in combination with plaintiff's other medically determinable impairments, resulted in a decreased ability to perform work-related functions. See Pratt v. Sullivan, 956 F.2d 830, 835-36 (8th Cir. 1992) (failure to properly evaluate impairment at Step 2 essentially removed such impairment from further consideration, including considering the effects of such impairment in combination with the effects of other physical impairments).

Although the ALJ may have considered and for valid reasons rejected evidence that plaintiff's congenital deformity resulted in functional limitations, the ALJ's decision is silent as to this matter. As such, this Court would be left to speculate as to whether any rejection of such evidence would be supported by substantial evidence on the record as a whole. This the Court cannot do. Accordingly, this cause should be remanded to the

Commissioner for further consideration of plaintiff's congenital deformity of the right arm. See Jones, 65 F.3d at 104.

D.    Medical-Vocational Guidelines

In his decision, the ALJ determined plaintiff to have the RFC to perform the full exertional range of sedentary work. Upon considering plaintiff's age, education, vocational factors, and RFC, the ALJ determined that the Medical-Vocational Guidelines directed a finding that plaintiff was not disabled. The ALJ made no findings as to whether plaintiff suffered any non-exertional limitations.

Residual functional capacity is defined wholly in terms of the physical ability to perform certain exertional tasks. If a claimant suffers from only exertional impairments, the Commissioner may refer to the Medical-Vocational Guidelines to conclude whether the claimant has the RFC to perform work which exists in significant numbers in the national economy. See Pearsall, 274 F.3d at 1219; Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). If a claimant has a non-exertional impairment, the Guidelines generally are not controlling and cannot be used to direct a conclusion of disabled or not disabled without regard to other evidence, such as vocational testimony. Hunt v. Heckler, 748 F.2d 478, 480 (8th Cir. 1984). Use of the Guidelines is permissible, however, where a non-exertional impairment is found to exist "provided that the ALJ finds, and the record supports the finding, that the non-exertional impairment does not significantly diminish the claimant's residual functional capacity to perform the full

range of activities listed in the Guidelines." <u>Harris v. Shalala</u>, 45 F.3d 1190, 1194 (8th Cir. 1995) (citing <u>Thompson v. Bowen</u>, 850 F.2d 346, 349-50 (8th Cir. 1988)).  <u>See also</u> <u>Bolton v. Bowen</u>, 814 F.2d 536, 537-38 (8th Cir. 1987).  The burden is on the ALJ to demonstrate that the use of the Guidelines is proper.  <u>Lewis v. Heckler</u>, 808 F.2d 1293, 1298 (8th Cir. 1987).

Pain is a non-exertional impairment.  <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998); <u>Hunt</u>, 748 F.2d at 481. Although "[u]se of the Guidelines is appropriate if the ALJ explicitly discredits subjective allegations of pain for a legally sufficient reason, such as inconsistencies in the record," <u>Bolton</u>, 814 F.2d at 538; <u>see also</u> <u>Reynolds v. Chater</u>, 82 F.3d 254, 258-59 (8th Cir. 1996); <u>Carlock v. Sullivan</u>, 902 F.2d 1341, 1343 (8th Cir. 1990); <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1187 (8th Cir. 1989), there is not substantial evidence on the record here to support the ALJ's adverse credibility determination regarding plaintiff's subjective complaints of pain.  <u>See</u> discussion, <u>supra</u>, at Section V.A. Indeed, the record supports a finding that plaintiff suffers from pain, a non-exertional impairment.  Although the pain may not be severe enough in itself to be disabling, the plaintiff is nevertheless entitled to have a vocational expert testify as to the effect this impairment has on her RFC.  <u>Beckley</u>, 152 F.3d at 1060; <u>Hunt</u>, 748 F.2d at 480-81.  Therefore, the ALJ's decision to rely solely on the Guidelines was inappropriate.  <u>Beckley</u>, 152 F.3d at 1060.

This same reasoning applies to the ALJ's failure to

address plaintiff's obesity as a non-exertional impairment. "Obesity is . . . a nonexertional impairment which might significantly restrict a claimant's ability to perform the full range of sedentary work." <u>Lucy v. Chater</u>, 113 F.3d 905, 909 (8th Cir. 1997). The impact of this non-exertional limitation should be considered by a vocational expert in addition to plaintiff's pain and other limitations. <u>Id.</u>

Finally, manipulative limitations are likewise non-exertional impairments. <u>Asher v. Bowen</u>, 837 F.2d 825, 827 n.2 (8th Cir. 1988). Plaintiff's congenital deformity which results in her diminished ability to make a fist and grip with her right hand could limit the sedentary jobs plaintiff could perform. <u>Sanders v. Sullivan</u>, 983 F.2d 822, 824 (8th Cir. 1992). However, as noted <u>supra</u> at Section V.C, the ALJ did not address plaintiff's manipulative limitations and, as such, made no finding as to whether such limitations may or may not significantly diminish plaintiff's RFC to perform the full range of sedentary activities. Without such a finding, the ALJ failed to meet his burden of demonstrating that his use of the Guidelines was proper despite the presence of this non-exertional limitation.

## VI. Conclusion

Therefore, for all of the foregoing reasons, the Commissioner's decision is not supported by substantial evidence on the record as a whole. It would be inappropriate, however, to reverse the Commissioner's decision at this time and award plaintiff benefits because the current record does not conclusively

demonstrate that plaintiff is disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed and that this cause be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **January 5, 2009.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


_Fredrick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this _23rd_ day of December, 2008.